UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

DANIEL LEVI COLE,

      Plaintiff,

v.                                                                  Case No. 2:20-cv-524-SPC-NPM

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

_____

## REPORT AND RECOMMENDATION

Plaintiff Daniel Levi Cole seeks judicial review of a denial of Social Security disability insurance benefits. The Commissioner of the Social Security Administration filed the transcript[1] of the proceedings, and the parties filed a Joint Memorandum (Doc. 28). As discussed in this report, the decision of the Commissioner should be affirmed.

## I.   Eligibility for Disability Benefits and the Administration's Decision

### A.   Eligibility

The Social Security Act and related regulations define disability as the inability to do any substantial gainful activity by reason of one or more medically determinable physical or mental impairments that can be expected to result in death

---

[1] Cited as "Tr." followed by the appropriate page number.

or that have lasted or can be expected to last for a continuous period of not less than twelve months.[2] Depending on its nature and severity, an impairment limits exertional abilities like standing or reaching, nonexertional abilities like seeing or hearing, or aptitudes necessary to do most jobs such as using judgment or dealing with people.[3] And when functional limitations preclude a return to past work or doing any other work sufficiently available in the national economy (or an impairment meets or equals the severity criteria for a disabling impairment as defined in the regulatory "Listing of Impairments"), the person is disabled for purposes of the Act.[4]

### B.     Factual and procedural history

On December 23, 2016, Cole applied for a period of disability and disability insurance benefits. (Tr. 143, 150, 332). He asserted an onset date of March 20, 2013, alleging disability due to the following: major depression; bipolar and anxiety disorders; post-traumatic stress disorder (PTSD); and stroke. (Tr. 143-144, 153). As of the alleged onset date, Cole was 30 years old, and he completed some high school and received a GED. (Tr. 89, 143, 152, 378). He previously worked as a pizza

---

[2] *See* 42 U.S.C. §§ 416(i), 423(d), 1382c(a)(3); 20 C.F.R. §§ 404.1505, 416.905.

[3] *See* 20 C.F.R. §§ 404.1594(b)(4), 416.994(b)(1)(iv); *see also* 20 C.F.R. §§ 404.1545(b)-(d) (discussing physical, mental, and other abilities that may be affected by impairment(s)), 416.945(b)-(d) (same), 404.1522(b) (providing examples of abilities and aptitudes necessary to do most jobs), 416.922(b) (same).

[4] *See* 20 C.F.R. §§ 404.1511, 416.911(a).

deliverer, an air conditioning mechanic helper, and a maintenance worker (Tr. 23, 68-71, 123-126, 378).

Cole's application was administratively denied initially on May 3, 2017, and upon reconsideration on August 3, 2017. (Tr. 143-151, 152-160). At Cole's request, Administrative Law Judge Eric Anschuetz held a hearing on May 23, 2019. (Tr. 84, 257-258). The ALJ issued an unfavorable decision on November 20, 2018, finding Cole not disabled from the alleged onset date through December 31, 2014, the date last insured. (Tr. 161-171).

Cole's timely request for review by the administration's Appeals Council was granted on March 14, 2019. The Appeals Council vacated the hearing decision and remanded the case. (Tr. 179-181). ALJ Anschuetz then held another hearing on November 12, 2019. (Tr. 34). The ALJ issued an unfavorable decision on January 21, 2020, again finding Cole not disabled from the alleged onset date through the date last insured. (Tr. 12-25).

Cole's second request for review by the administration's Appeals Council was denied. (Tr. 1-3). Cole then brought the matter to this Court, and the case is ripe for judicial review.

### C. The ALJ's decision following remand from the Appeals Council

An ALJ must perform a five-step sequential evaluation to determine if a

claimant is disabled. 20 C.F.R. § 404.1520(a)(1). This five-step process determines:

> (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether these impairments meet or equal an impairment listed in the Listing of Impairments; (4) if not, whether the claimant has the residual functional capacity ("RFC") to perform his past relevant work; and (5) if not, whether, in light of his age, education, and work experience, the claimant can perform other work that exists in significant numbers in the national economy.

*Atha v. Comm'r, Soc. Sec. Admin.*, 616 F. App'x 931, 933 (11th Cir. 2015) (internal quotation omitted); *see also* 20 C.F.R. § 404.1520(a)(4).

The governing regulations provide that the Social Security Administration conducts this "administrative review process in an informal, non-adversarial manner." 20 C.F.R. § 404.900(b). Unlike judicial proceedings, the administration's hearings "are inquisitorial rather than adversarial." *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1364 (11th Cir. 2018) (quoting *Sims v. Apfel*, 530 U.S. 103, 111 (2000) (plurality opinion)). "Because Social Security hearings basically are inquisitorial in nature, '[i]t is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits.'" *Id*. Indeed, "at the hearing stage, the Commissioner does not have a representative that appears 'before the ALJ to oppose the claim for benefits.'" *Id*. (quoting *Crawford & Co. v. Apfel*, 235 F.3d 1298, 1304 (11th Cir. 2000)). "Thus, 'the ALJ has a basic duty to develop a full and fair record. This is an onerous task, as the ALJ must scrupulously and conscientiously

probe into, inquire of, and explore for all relevant facts.'" *Id.* (quoting *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015)).

Nonetheless, while the claimant is temporarily relieved of the burden of production during step five as to whether there are enough jobs the claimant can perform, the claimant otherwise has the burdens of production and persuasion throughout the process. *Id.* at 1359; *see also* 20 C.F.R. § 404.1512 (providing that the claimant must prove disability); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983) ("The scheme of the Act places a very heavy initial burden on the claimant to establish existence of a disability by proving that he is unable to perform his previous work."); *Doughty v. Apfel*, 245 F.3d 1274, 1280 (11th Cir. 2001) ("[T]he overall burden of demonstrating the existence of a disability as defined by the Social Security Act unquestionably rests with the claimant.").

At step one of the evaluation, the ALJ found Cole had not engaged in substantial gainful activity from March 20, 2013, through December 31, 2014. (Tr. 18). At step two, the ALJ characterized Cole's severe impairments as: status post intracranial hemorrhage[5] on March 20, 2013; bipolar disorder; and anxiety disorder. (Tr. 18). At step three, the ALJ determined Cole did not have an impairment or combination of impairments that met or medically equaled the severity of a listed

---

[5] In other words, Cole suffered from a stroke, which is also described in the record as a cerebrovascular accident (CVA).

impairment. (Tr. 21).

As the predicate to step four, the ALJ arrived at the following RFC:

> [T]hrough the date last insured, the claimant had the residual functional capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk 6 hours of an 8-hour workday; sit 6/ hours of an 8-hour workday; never climb ladders, ropes, or scaffolds; frequently climb ramps and stairs; occasionally balance, stoop, kneel, crouch, and crawl; must avoid workplace hazards such as unprotected heights and unshielded rotating machinery; cannot work in hazardous work environments; limited to occasional contact with supervisors, coworkers, and the public; limited to simple tasks and cannot perform complex tasks; and no commercial driving.

(Tr. 20).[6] Consequently, at step four, the ALJ determined Cole was not capable of performing his past relevant work. (Tr. 23). At step five, the ALJ found Cole could perform other jobs that existed in significant numbers in the national economy. In support, a vocational expert opined during the ALJ hearing that three occupations represent the kinds of jobs that an individual with Cole's age, education, work experience, and RFC could perform:

(1)     raw shellfish preparer (DOT# 311.674-014); light; SVP 2; with 21,000 positions in the national economy;

(2)     housekeeper (DOT# 323.687-014); light; SVP 2; with 133,000 positions in the national economy; and

(3)     marker (DOT# 209.587-034); light; SVP 2; with 310,000 positions in the national economy.

(Tr. 24-25).[7]

---

[6] While not expressly noted in the RFC summary, the ALJ found Cole capable of performing light work. (Tr. 24).

[7] The DOT numbers refer to the *Dictionary of Occupational Titles* and its detailed explanations concerning each occupation's requirements. These descriptions include exertion and skill levels.

## II.   Analysis

Cole's appeal presents the following issues:

(1)   whether the ALJ erred in how he assigned weight to several opinions;

(2)   whether the ALJ erred in not finding Cole's PTSD severe or including relevant limitations in the RFC and in hypothetical questions to the vocational expert;

(3)   whether substantial evidence supports the ALJ's finding that Cole can perform light work; and

(4)   whether the jobs cited by the ALJ fit within the RFC.

(Doc. 28, pp. 16, 23, 27, 38).

### A.   Standard of review

The Court "may not decide the facts anew, make credibility determinations, or reweigh the evidence." *Buckwalter v. Acting Comm'r of Soc. Sec.*, 997 F.3d 1127, 1132 (11th Cir. 2021). While the Court must account for evidence both favorable and unfavorable to a disability finding and view the evidence as a whole, *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), the Court's review of the administration's decision is limited to determining whether "it is supported by substantial evidence and based on proper legal standards." *Crawford v. Comm'r of*

---

Exertion refers to the work—in a purely physical sense—that the job requires, and it is divided into five categories: sedentary, light, medium, heavy, and very heavy. Skill refers to how long it takes to learn the job, and it is divided into three categories: unskilled, semiskilled, and skilled. The "SVP" (Specific Vocational Preparation) provides further subdivision of the three skill categories into nine levels: SVP 1 and 2 are unskilled; SVP 3 and 4 are semiskilled; and SVP 5 through 9 are skilled.

*Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Goode v. Comm'r of Soc. Sec.*, 966 F.3d 1277, 1280 (11th Cir. 2020) (quoting *Crawford*, 363 F.3d at 1158)).

"[T]he threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). The inquiry is "case-by-case," and "defers to the presiding ALJ, who has seen the hearing up close." *Id*. at 1157. If supported by substantial evidence, the ALJ's findings of fact are conclusive. 42 U.S.C. § 405(g). This means the district court will affirm, even if the court would have reached a contrary result as finder of fact, and even if the court finds that the evidence "preponderates against" the agency's decision. *Noble v. Comm'r of Soc. Sec.*, 963 F.3d 1317, 1323 (11th Cir. 2020) (quoting *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991)).

## B.   Whether the ALJ erred in how he assigned weight to several opinions

Cole argues, and grounds his other arguments on the contention that, the ALJ erred in his treatment of the opinions of Drs. Arcement, Nelsen, and Carver. (Doc. 28, pp. 27-33; *see also* Doc. 28, p. 17). Weighing the opinions and findings of treating, examining, and non-examining physicians is an integral part of the ALJ's residual-functional-capacity determination. *See Rosario v. Comm'r of Soc. Sec.*, 877

F. Supp. 2d 1254, 1265 (M.D. Fla. 2012).[8] Whenever a physician offers an opinion concerning the nature and severity of a claimant's impairments—including the claimant's symptoms, diagnosis, and prognosis; physical and mental restrictions; or what the claimant can still do—the ALJ must state with particularity the weight given to the physician's opinion and the ALJ's reasons therefor. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178-1179 (11th Cir. 2011).[9] Without such an explanation, "it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence." *Id.* at 1179 (quoting *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981)).

With respect to applications filed before March 27, 2017, an ALJ must consider several factors when assigning weight to medical opinions. 20 C.F.R. § 404.1527(c). "For instance, the Social Security regulations command that the ALJ consider: (1) the examining relationship; (2) the treatment relationship, including the length and nature of the treatment relationship; (3) whether the medical opinion is

---

[8] Cole's claim was filed on December 23, 2016, and the regulations applicable to claims at that time required an assignment of weight by the ALJ to medical opinions. But due to an update in the regulations, medical opinions related to claims filed on or after March 27, 2017, are subject to a different assessment about their persuasiveness rather than weight. *See* 20 C.F.R. §§ 404.1520c, 404.1527(c).

[9] For claims filed on or after March 27, 2017, the term "medical opinion" is no longer defined to include a diagnosis, prognosis, or judgment about the nature and severity of an impairment. Rather, it refers only to statements about what the claimant can still do despite any impairment(s), and whether there are any limitations in the claimant's abilities to perform the various demands of work and adapt to work-related conditions. *See* 20 C.F.R. § 404.1513(a)(2).

amply supported by relevant evidence; (4) whether an opinion is consistent with the record as a whole; and (5) the doctor's specialization." *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1260 (11th Cir. 2019) (citing *Sharfarz v. Bowen*, 825 F.2d 278, 280 (11th Cir. 1987)).

Absent "good cause," the opinion of a treating physician must be given "substantial or considerable weight" *Williams v. Comm'r, Soc. Sec. Admin.*, 805 F. App'x 692, 694 (11th Cir. 2020) (citing *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011)); *see* 20 C.F.R. § 404.1527(c)(2) (noting that an ALJ must provide "good reasons" for the weight given to a treating source's opinion). "Good cause" exists when "(1) the opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the opinion was conclusory or inconsistent with the doctor's own medical records." *Williams*, 805 F. App'x at 694 (cleaned up).

### 1.    Brian Arcement, M.D.

On March 20, 2013, Cole presented to the emergency room at Gulf Coast Medical Center. Dr. Walter Ray Simmons, D.O., diagnosed intracranial hemorrhage with some arachnoid extension after conducting a CT scan and other tests. Dr. Simmons noted that Cole's stroke may have been a consequence of his IV drug use, resulting in a septic emboli bleed. Cole was then admitted to the intensive care unit. (Tr. 1137-1139).

During this inpatient period, cardiologist Dr. Brian Arcement performed a cardiology consultation on March 22, 2013. (Tr. 1147-1149). Arcement assessed IV drug abuse and likely valvular endocarditis due to evidence of septic emboli syndrome. (Tr. 1148). While Arcement ordered a transesophageal echocardiogram (Tr. 1148-1149), other physicians performed the procedure and treated Cole (Tr. 1150, 1152-1154). Cole's physicians did not recommend surgical intervention, and Cole left the hospital against medical advice. (Tr. 1140).

The next time Cole visited Arcement was on February 5, 2016—over a year after the date last insured. During this visit, Arcement assessed status post redo root replacement, annular reconstruction; aortic valve regurgitation; streptococcal sangius bacteremia and prosthetic valve endocarditis; fever; and cardiovascular accident (cerebral infarction). (Tr. 577).

Cole presented to Arcement again on other occasions: November 9, 2016 (Tr. 1226); March 12, 2018 (Tr. 1253, 1379); May 7, 2018 (Tr. 1293, 1294); June 13, 2019 (Tr. 1807); and July 1, 2019 (Tr. 1827, 1834). During these visits, Cole complained of heart-related symptoms. Arcement examined Cole and performed limited echocardiograms. In May 2018, Arcement prescribed Coreg 3.25 mg twice a day (Tr. 1293), and he noted one year later that Cole was generally doing well given his heart-related diagnoses and continued Cole on his then-current medications. (Tr. 1807, 1814).

Arcement completed an undated medical source statement, in which he opined Cole can occasionally carry 10 to 20 pounds due to his left arm impairment and cerebrovascular accident; can stand and/or walk for a total of less than two hours in an 8-hour workday in addition to normal breaks because of his cerebrovascular accident and left side weakness; can sit for a total of less than six hours in an 8-hour workday due to his PTSD, bipolar, and anxiety; and Cole must alternate between sitting and standing to relieve pain and discomfort. (Tr. 1339). He further opined about postural limitations, such that Cole can perform no climbing or crawling, is unable to balance, can kneel and crouch for less than one-third of the workday, and can stoop and bend for one-third of the workday. (Tr. 1339). And Arcement opined about Cole's manipulative limitations, such that he cannot reach overhead with the left arm, can finger (fine manipulation) for less than one-third of the workday, and can handle (gross manipulation) for two-thirds of the workday. These manipulative limitations were due to his cerebrovascular accident. (Tr. 1339).

Furthermore, Arcement opined that Cole must take a five-minute-minimum break every 20 minutes and has spotty vision, both because of his cerebrovascular accident. (Tr. 1339-1340). Arcement opined Cole has nonexertional limitations due to chronic pain, is required to lie down during the day to relieve pain, would be expected to rest 20 minutes in the morning and 20 minutes in the afternoon during migraines. Arcement opined Cole has limitations due to mental impairments,

including PTSD, bipolar, anxiety, and depression. (Tr. 1340). He opined Cole can use judgment and deal with changes in a routine work setting for less than one-third of the workday and can concentrate, remember simple instructions, and respond to supervision, coworkers, and usual work situations for one-third of the workday. Arcement opined Cole has no limitations in following, carrying out, or understanding simple instructions. These limitations, he opined, are primarily the result of pain or a mental impairment as Cole has numbness and weakness from cerebrovascular accident and left arm and hand. (Tr. 1340). He further opined Cole would be expected to be off task at work 30% to 40% of the time and would be expected to be absent from work 7 or 8 days per month due to doctor appointments or medical impairments. (Tr. 1340). Arcement stated his opinions were provided within a reasonable degree of medical certainty and he had read the medical records before and after the onset date of disability. (Tr. 1340).

As to Arcement's medical source statement, Cole first appears to take issue with the fact that the ALJ did not recite each of Arcement's specific opinions. (Doc. 28, pp. 17, 27-28). In his decision, the ALJ stated:

> There is an undated Medical Source Statement from Dr. Arcement finding the claimant has the residual functional capacity to lift carry [sic] up to 20 pounds. The claimant has left side weakness due to CVA. The claimant has PTSD, bipolar and anxiety. Dr. Arcement indicated the claimant must alternate between sitting and standing to relive pain and discomfort, and must take breaks every 20 minutes. Dr. Arcement also indicated some mental, postural, and manipulative limitations and would be off task 30-40% of the time (Exhibit 13F). There are no treatment records from Dr. Arcement during

> the period at issue and there is no support for the assessed limitations within the evidence dated prior to the claimant's date last insured. As such, I afford little weight to the opinions rendered.

(Tr. 23).

The ALJ expressly and adequately articulated the weight afforded to all "opinions" in Arcement's medical source statement. He was not required to recite every finding or opinion therein. *See Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (stating "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision").

Cole also takes issue with the ALJ's incorrect statement that there were no treatment records from Arcement during the period at issue. (Doc. 28, p. 28). Even the Commissioner concedes this statement was incorrect because Arcement examined Cole on March 22, 2013, shortly after the stroke that occurred on the alleged onset date. (Doc. 28, p. 35 n. 8). The March 22, 2013 note primarily indicates Arcement conducted a cardiology consultation, during which he assessed IV drug abuse and likely valvular endocarditis due to evidence of septic emboli syndrome. (Tr. 1148). However, Arcement did not assess any work-related limitations at that time, and other than this consultation, Arcement did not examine Cole at any other point before December 31, 2014.

The ALJ was otherwise correct that the bulk of Arcement's treatment notes came long after the date last insured, and his undated medical source statement did

not have support for the relevant time period. Evidence generated *after* a claimant's date last insured is generally not relevant because a claimant must prove he became disabled prior to the expiration of his disability insured status. *See* 42 U.S.C. §§ 416(i)(3), 423(a), (c); 20 C.F.R. §§ 404.101, 404.130, 404.131, 404.315(a)(1), 404.320(b)(2); *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005); *see also Hughes v. Comm'r of Soc. Sec. Admin.*, 486 F. App'x 11, 13-14 (11th Cir. 2012) (concluding that three opinions of treating physician rendered after claimant's date last insured did not appear to be based on claimant's condition during the relevant period and were therefore "not particularly relevant to whether [claimant] was disabled for purposes of [disability insurance benefits]"); *Douglas v. Astrue*, No. 1:10-cv-8-MP-GRJ, 2011 WL 4809089, *13 (N.D. Fla. June 9, 2011) ("A fundamental problem with Plaintiff's argument is that it is based almost entirely upon medical evidence which concerns medical treatment and examination years after the Plaintiff's date last insured . . . ."), *report and recommendation adopted*, 2011 WL 4809055 (N.D. Fla. Oct. 11, 2011), *aff'd sub nom. Douglas v. Comm'r of Soc. Sec.*, 486 F. App'x 72 (11th Cir. 2012).

The ALJ also discounted this opinion due to the lack of support in the record. Even considering *all* of Arcement's treatment notes, there was no support in them for assessing anything but cardiology-related limitations. For example, Arcement's opinions as to Cole's mental limitations have no support in his treatment notes

because, as a cardiologist, Arcement unsurprisingly did not treat Cole for any mental health issues, and there is no evidence of mental health treatment in his notes. *See* 20 C.F.R. § 404.1527(c)(2) ("Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion …. For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her medical opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain.").

And while Cole argues that Arcement's opined limitations stem from his 2013 stroke, Arcement did not indicate that his opinions related back to the relevant time period or were applicable to Cole's then-existing condition. It is just as likely Arcement's opinions were as to Cole's condition at the time the opinions were rendered, whenever that may have been given the unanswered question of *when* Arcement's opinions were made.[10] The ALJ provided substantial evidence for his treatment of Arcement's opinions, and the Court will not disturb that assessment.

### 2.   Brittany Nelsen, Psy.D.

Cole's law firm referred him to LSW Psychological Services for a limited focus psychological evaluation to help determine his suitability for social security

---

[10] During the first ALJ hearing, Cole's attorney suggested Arcement's medical source statement was rendered after the date last insured. (Tr. 101-102).

benefits. (Tr. 100, 1300). So, on June 28, 2018, licensed clinical psychologists Brittany Nelsen, Psy.D. and LeighAnn Wong, Ph.D. evaluated Cole. They stated Cole had "concerning" T-scores[11] ranging from 76 to 81 in somatization, obsessive-compulsive, interpersonal sensitivity, depression, anxiety, hostility, phobic anxiety, paranoid ideation, psychoticism, and global severity index. (Tr. 1301). The World Health Organization Disability Assessment Schedule 2.0 completed by Cole and his fiancée indicated he had a moderate level of disability in understanding and communicating and getting around, and they indicated a severe level of disability in getting along with people, life activities, and participation in society, such that he is likely to experience debilitating impairment in his everyday life. (Tr. 1301). On the PTSD checklist for DSM-5 (PCL-5), his total symptom severity score was 74%, indicating he met criteria for a diagnosis of PTSD. (Tr. 1301). Nelsen diagnosed bipolar disorder, current episode depressed, with psychotic features, and PTSD. (Tr. 1302).

Nelsen simultaneously completed a mental residual functional capacity assessment form. (Tr. 1341-1345). In the context of listing 12.04, Nelsen opined that there is medical documentation of bipolar disorder characterized by pressured speech, flight of ideas, inflated self-esteem, decreased need for sleep, distractibility,

---

[11] A "T-score" is "a type of standardized score based on a score distribution that has a mean of 50 and a standard deviation of 10." *See* AM. PSYCH. ASS'N, *APA Dictionary of Psychology*, https://dictionary.apa.org/t-score (last visited Nov. 16, 2021).

involvement in activities that have a high probability of painful consequences that are not recognized, and increase in goal-directed activity or psychomotor agitation. She also opined Cole is markedly limited in both interacting with others and adapting or managing himself and moderately limited in both understanding, remembering, or applying information and concentrating, persisting, or maintaining pace. (Tr. 1341). She stated that her opinions were provided within a reasonable degree of medical certainty and that Cole's condition existed since December 23, 2016 (two years after the date last insured). But she did not read the medical records before and after the onset date of disability. (Tr. 1342).

Nelson then assessed Cole's areas of mental functioning and found he had moderate, marked, and extreme limitations in specific abilities. Nelsen opined that Cole was extremely[12] limited in the following abilities: to work in coordination with or proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes;

---

[12] Extremely limited means limited 49 to 64% of the time. (Tr. 1343, 1345).

to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and to travel in unfamiliar places or use public transportation. (Tr. 1343-1344). She further opined Cole was markedly[13] limited in the following abilities: to understand and remember detailed instructions; to carry out detailed instructions; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to respond appropriately to changes in the work setting; to be aware of normal hazards and take appropriate precautions; and to set realistic goals or make plans independently of others. (Tr. 1343-1344). And she opined Cole was moderately[14] limited in the following abilities: to remember locations and work-like procedures; to understand and remember very short and simple instructions; to carry out very short and simple instructions; to maintain attention and concentration for extended periods; to make simple work-related decisions; and to ask simple questions or request assistance (Tr. 1343). Finally, Nelsen opined that Cole has been disabled from substantial gainful work since December 23, 2016. (Tr. 1344).

As to Nelsen's opinion, the ALJ stated the following:

Brittany Nelsen, Psy.D., completed a Medical Source Statement on June 28, 2018. She indicated the claimant was examined on June 28, 2018. It was opined that the claimant has a depressive disorder and bipolar disorder that meet the criteria of listing 12.04. It was opined that the claimant has marked limitations in his ability to interact with others and his ability to adapt or

---

[13] Markedly limited means limited 33 to 48% of the time. (Tr. 1343, 1345).

[14] Moderately limited means limited 17 to 32% of the time. (Tr. 1343, 1345).

manage himself. It was further opined that the claimant has 'extreme' work related functional limitations (Exhibit 14F). I give a [sic] little weight to these opinions, as they are dated well after the claimant's alleged onset date and date last insured. Moreover, there is no evidence dated during the period at issue that supports the assessed limitations.

(Tr. 23).

As with Dr. Arcement's opinion, Cole takes issue with the fact that the ALJ did not recite all of Nelsen's opinions. (Doc. 28, pp. 29-30, 32). As previously discussed, this does not constitute error. Also, Nelsen was not a treating physician. Rather, she was a one-time examining psychologist who, as the ALJ correctly noted, only examined him in 2018, nearly four years after Cole's date last insured. The ALJ was not required to provide good reasons for discounting this opinion—he need only consider the opinion and articulate weight he assigned to it. 20 C.F.R. § 404.1527(c)(2); *see Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1160 (11th Cir. 2004) ("The ALJ correctly found that, because Hartig examined Crawford on only one occasion, her opinion was not entitled to great weight.") (citing *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987) (stating that a doctor who examines a claimant on only one occasion is not considered a "treating physician")).

The ALJ adhered to these requirements and went even further by providing reasons for affording little weight, including the timing of the opinion as well as the lack of supportability in the record for the assessed limitations for the relevant time period. Even Nelsen noted that she did not review any medical records from before

(or even after) the onset date of disability. (Tr. 1342). And, as noted by Dr. Carver, the record contains no mental health treatment records from the relevant period. (Tr. 21, 50).[15] Thus, there was no error.

### 3.    Joseph Carver, Ph.D.

The ALJ utilized the aid of medical expert Dr. Joseph Carver, Ph.D., during the November 12, 2019 hearing. (Tr. 34). Dr. Carver is a licensed clinical psychologist who neither examined nor treated Cole; Carver did, however, review the record and listen to Cole's hearing testimony. (Tr. 36, 48-49). The ALJ summarized Carver's testimony and opinions as follows:

> Dr. Carver, the medical expert, testified there was no evidence of mental health conditions during the period at issue. However, he testified that the claimant began psychiatric treatment in 2016, and has had ongoing mental health treatment since. Dr. Carver testified that the claimant reported depressed mood; diminished interest; sleep disturbances; psychomotor agitation; and difficulty maintaining concentration. Dr. Carver further testified that, with respect to the paragraph 'B' criteria, the claimant was mildly impaired in understanding, remembering, or applying information. In interacting with others, the claimant had a moderate impairment, as the claimant had a history of emotional control and temper issues, making working in close relationships difficult. It was also noted that exhibit 9F showed behavioral issues. With regard to concentrating, persisting, or maintaining pace, the claimant had a moderate limitation, as medications are known to create drowsiness and the claimant indicated most of the medications had warnings not to drive or operate machinery. As for adapting or managing oneself, Dr. Carver testified that there were neurological issues and intense substance abuse. He testified that after 2014, the claimant reported physical problems and the claimant continued to use marijuana, which would eliminate jobs that required a drug-free workplace. It was opined that the claimant had a mild limitation in his ability to manage himself. Dr. Carver opined there would be some functional limitations, such

---

[15] Despite the lack of mental health treatment notes for the relevant time period, the ALJ still included mental health limitations in the RFC. (Tr. 20).

> that the claimant would work best with occasional contact with the public, coworkers, and supervisors. He has the ability to pay attention to routine, repetitive work, but not tedious work or work requiring high levels of sustained attention. The claimant would also have issues with a hazardous work environment, as his medications cause inattentiveness. The claimant could not work with flatterers, scaffolds, heights, or in an environment that would require him to be alert. The claimant can understand simple, detailed, and some complex work activity (Hearing testimony).

(Tr. 21-22). The ALJ repeated summaries of Carver's opinion and afforded great

weight to it, explaining as follows:

> Dr. Carver testified that the claimant had mild limitations in understanding, remembering, or applying information. In interacting with others, the claimant had a moderate impairment. With regard to concentrating, persisting, or maintaining pace, the claimant had a moderate limitation. As for adapting or managing oneself, Dr. Carver opined that the claimant had a mild limitation. Dr. Carver opined there would be some functional limitations, such that the claimant would work best with occasional contact with the public, coworkers, and supervisors. He has the ability to pay attention to routine, repetitive work, but not tedious work or work requiring high levels of sustained attention. The claimant would also have issues with a hazardous work environment, as his medications cause inattentiveness. The claimant could not work with ladders, scaffolds, heights, or in an environment that would require him to be alert. The claimant can understand simple, detailed, and some complex work activity (Hearing testimony). I afford great weight to the testimony from Dr. Carver, as he had the opportunity to review the entire medical record and based his opinions on the evidence dated during the period at issue and also commented on the evidence dated after the period at issue. His opinions regarding the claimant's mental limitations are supported by the evidence of record, including testimony from the claimant.

(Tr. 22-23).

Cole contends the ALJ's assessment of Carver's opinion is undercut by

purported inconsistent statements. Confusingly, Cole appears to argue the ALJ

should have afforded *less* weight to Carver's opinions. (Doc. 28, pp. 31-32). Yet,

Carver's opinions were the primary—if not, only—basis the ALJ had for including *any* mental limitations in Cole's RFC. (Tr 21-23). An ALJ may rely on a non-examining consulting physician's opinion if it is consistent with the medical evidence. *See Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1160 (11th Cir. 2004) (ALJ did not err in placing great weight on opinion of consulting physician, whose opinion was consistent with objective medical evidence and another physician's opinion).

In any case, Cole's arguments are without merit. First, Cole argues Carver's testimony is contradictory because Carver testified there was no evidence of mental health conditions during the period at issue (Tr. 50-51), yet he also testified that Cole had more than minimal work-related mental limitations during the period at issue (Tr. 51-57), which the ALJ found reasonable (Tr. 22). But Carver never said that Cole did not have any mental health *limitations* during the relevant period—he simply observed that the medical record was sparse as to Cole's mental *conditions* because Cole did not seek mental health treatment until December 2016. (Tr. 51). Carver implicitly found mental health treatment records from December 2016 onwards related back to the relevant time period—they indicate some mental health limitations existed during the relevant time period even though there were no mental health records before December 2016. Therefore, no inconsistency exists between Carver's statement that there was no evidence of mental health conditions during the

relevant period and the statement that Cole had some mental limitations during the relevant period.

Cole also argues the ALJ failed to include in the RFC or in hypothetical questions to the vocational expert references to Carver's opinion that Cole did not have the ability to pay attention to work that is "tedious" or requires a "high level of sustained attention." (Tr. 56). But these statements are not expressed in RFC terms. The DOT does not rate jobs based on tediousness. The ALJ found that Cole could perform jobs requiring repetitive work, which is consistent with Carver's testimony to that effect. (Tr. 22, 56). The ALJ also translated the "sustained attention" limitation into Cole's RFC by limiting him to no hazards, which was incorporated in the hypothetical questions to the vocational expert. (Tr. 20, 74). Besides, Cole does not demonstrate how any of the representative occupations are either tedious or require a high level of sustained attention, so he has failed to show any harmful error. *See Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018) (explaining that if at step five, the Commissioner meets the burden of showing jobs exist in significant numbers in the national economy, "the burden shifts back to the claimant to prove [he] is unable to perform the jobs suggested by the [Commissioner]." (citation omitted)).

Cole also contends the ALJ failed to include in the RFC or in hypothetical questions to the vocational expert references to Carver's purported opinion that Cole

required extra supervision, which allegedly conflicted with his statement that Cole would work best with just occasional contact with the public, coworkers, and supervisors. (Tr. 56). In response to the ALJ's question whether Cole would require extra supervision, Carver answered: "Yes, sir, we would expect, I'm sorry, some functional limitations, due to these B Criteria." (Tr. 56). He immediately explained that Cole would work best with just occasional contact with the public, coworkers, and supervisors; and that Cole can pay attention to routine, repetitive work, but not work that is tedious or requires a high level of sustained attention. (Tr. 56). It is not entirely clear whether the "Yes, sir" portion of Carver's answer was simply acknowledging the question before answering it substantively or actually a substantive response. But just because supervision may need to be more thoughtful does not necessarily mean that it would need to occur with greater frequency. And any purported inconsistency is harmless error, again, because Cole has not shown that any of the representative occupations would require any form of extra supervision that he could not tolerate.

### C.   Whether the ALJ erred in not finding Cole's PTSD severe or including relevant limitations in the RFC and in hypothetical questions to the vocational expert

Cole next asserts the ALJ should have found PTSD was a severe impairment. He argues this was not harmless error because the ALJ did not include relevant

limitations in the RFC and in hypothetical questions to the vocational expert. (Doc. 28, pp. 23-26).

A severe impairment must bring about at least more than a minimal reduction in a claimant's ability to work and must last continuously for at least twelve months. *See* 20 C.F.R. § 404.1505(a). This inquiry "acts as a filter" so that insubstantial impairments will not be given much weight. *Tuggerson-Brown v. Comm'r of Soc. Sec.*, 572 F. App'x 949, 950 (11th Cir. 2014) (quoting *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987)). While the standard for severity is low, the severity of an impairment "'must be measured in terms of its effect upon ability to work.'" *D'Andrea v. Comm'r of Soc. Sec. Admin.*, 389 F. App'x 944, 945 (11th Cir. 2010) (quoting *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986)).

"Nothing requires that the ALJ must identify, at step two, all of the impairments that should be considered severe." *Heatly v. Comm'r of Soc. Sec.*, 382 F. App'x 823, 825 (11th Cir. 2010). Instead, the ALJ is only required to consider a claimant's impairments in combination, whether severe or not. *Id.* If any impairment or combination of impairments qualifies as "severe," step two is satisfied and the claim advances to step three. *Gray v. Comm'r of Soc. Sec.*, 550 F. App'x 850, 852 (11th Cir. 2013) (citing *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987)). Here, the ALJ determined Cole had severe impairments and continued to step three. (Tr. 18).

Moreover, Cole was not diagnosed with PTSD until June 2018 by Dr. Nelsen, which was three and a half years after December 31, 2014, his date last insured. (Tr. 1301-1302). Even Nelsen, whose opinion was given little weight, opined that Cole's condition existed since December 23, 2016, which is still two years after the date last insured. (Tr. 1342).

Cole also relies on subsequent diagnoses of PTSD from other sources who assessed "chronic" PTSD, suggesting that it extended over a period of years reaching back to before the date last insured. Dr. Maria Espinoza, M.D. (Tr. 1077) first encountered Cole in November 2016, and she assessed chronic PTSD with associated nightmares, but she did not provide an estimated onset date. (Tr. 1077, 1083). Heather D'Archangel, assessed chronic PTSD with an onset of March 13, 2019, the day she examined Cole. (Tr. 1779, 1781-1782). And Nadine Gordon, ARNP, who apparently worked at the same medical center as D'Archangel, also included chronic PTSD in her April 2019 notes (Tr. 1773), but again kept an onset of March 13, 2019 (Tr. 1771). Cole also noted that Gina Valo, NP, assessed PTSD on July 12, 2018 (Tr. 1312-1314). And cardiologist Dr. Arcement, whose opinion was afforded little weight, also assessed PTSD at an unknown time. (Tr. 1339-1340).

But none of these treatment notes or opinions suggest Cole's PTSD predated December 31, 2014. And simply because his condition was described as "chronic," Cole suggests this means it must have existed prior to his date last insured. But that

conjecture is not supported by the record. The ALJ was not required to discuss Cole's PTSD at step two or incorporate PTSD-related limitations in the RFC assessment because the evidence of PTSD is not relevant to the period at issue. Thus, the ALJ did not err.

> **D.** **Whether substantial evidence supports the ALJ's finding that Cole can perform light work**

Cole contends the ALJ's RFC finding that he could perform light work was not supported because the ALJ did not address certain discharge instructions that limited lifting to five to ten pounds, nor did the ALJ address Dr. Arcement's opinion that Cole can stand and walk for a total of less than two hours in an eight-hour workday. As to Arcement's opinion, the Court already found no error. Even if the ALJ were to have afforded more weight to Arcement's opinion, he opined that Cole could lift and carry up to twenty pounds, which undercuts Cole's other argument. (Tr. 1339).

The only issue here is whether the ALJ improperly failed to address the discharge instructions. But the hospital discharge note that Cole relies on is dated December 22, 2015 (Tr. 777-778), about one year after his date last insured. Cole was an inpatient from November 11, 2015, to December 22, 2015, during which he underwent open heart surgery. (Tr. 777). As such, the discharge instructions pertain to the open heart surgery that occurred well past his date last insured. (Tr. 777). As previously discussed, a treatment note well outside the relevant time period

pertaining to a procedure that did not occur in the relevant time period is of limited evidentiary value. *See* discussion *supra* p. 15. Thus, Cole has not shown that the ALJ erred in finding Cole could perform light work, including the ability to lift and carry twenty pounds occasionally and ten pounds frequently.

**E.      Whether the jobs cited by the ALJ fit within the RFC**

Finally, Cole argues the ALJ failed to resolve an apparent conflict for two of the representative occupations. (Doc. 28, pp. 39-40). Specifically, the raw shellfish preparer and marker jobs carry a GED reasoning level of 2, which requires the ability to carry out detailed but uninvolved instructions. Cole claims this contradicts the RFC limitation of performing simple instructions and simple routine repetitive tasks.

In *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1356 (11th Cir. 2018), the Eleventh Circuit held that ALJs "have an affirmative duty to identify apparent conflicts between the testimony of a Vocational Expert and the [Dictionary of Occupational Titles ("DOT")] and resolve them." If any apparent conflict exists, the ALJ must do more than simply ask the vocational expert whether her testimony is consistent with the DOT—the ALJ must "offer a reasonable explanation for the discrepancy, and detail in his decision how he has resolved the conflict." *Id.* The failure to do so "means that the ALJ's decision, when based on the contradicted [vocational expert] testimony, is not supported by substantial evidence." *Id.*

The issue here is whether an "apparent conflict" existed to trigger this duty.

An "apparent conflict" means "a conflict that is reasonably ascertainable or evident from a review of the DOT and the [vocational expert's] testimony… even if, after further investigation" it turns out there was no discrepancy. *Id.* at 1365. But recent Eleventh Circuit precedent forecloses Cole's argument that the raw shellfish preparer and marker occupations conflict with the RFC. In *Buckwalter v. Acting Comm'r of Soc. Sec.*, 997 F.3d 1127, 1134 (11th Cir. 2021), the court determined there was no apparent conflict between an RFC that limited the claimant's ability to "understand, carry-out, and remember simple instructions" and jobs like these that require a reasoning level of two. Rather, the Eleventh Circuit concluded that the difference between a reasoning level of one and a reasoning level of two was the "length" of the instruction, not the complexity. *Id.* at 1135.

Cole further argues the RFC limited him to no more than occasional contact with supervisors, coworkers, and the public, but the job of raw shellfish preparer requires frequent[16] talking. So, he contends the ALJ failed to resolve this apparent conflict with the DOT. (Doc. 28, pp. 41-42). The Commissioner appears to claim even if this constituted an apparent conflict, any error was harmless and *Washington*'s duty to resolve this conflict was not implicated. This is because the ALJ and vocational expert identified the housekeeper and marker jobs that exist in

---

[16] Frequent means existing from 1/3 to 2/3 of the time. *See* Raw Shellfish Preparer, DOT 311.674-014, 1991 WL 672692.

significant numbers in the economy that have no conflict with the limitation of only occasional contact with others. (Doc. 28, pp. 50-51). And Cole has not offered anything to rebut this point.

At step five, the Commissioner bears the burden of showing that there are a significant number of jobs in the national economy that the claimant can perform in light of the RFC and other factors. *Webster v. Comm'r of Soc. Sec.*, 773 F. App'x 553, 555 (11th Cir. 2019); 20 C.F.R. § 404.1520(a)(4)(v). With the aid of a vocational expert's testimony, the regulations require the ALJ to identify a significant number of jobs available in at least one occupation. *See* 20 C.F.R. § 404.1566(b) (requiring "a significant number of jobs (in one or more occupations)"); *see also Bellamy v. Comm'r of Soc. Sec.*, 734 F. App'x 735, 738 (11th Cir. 2018) (declining to address whether other occupations conflicted with the DOT because the vocational expert's testimony supported that the claimant could at least perform one occupation that was available in significant numbers). "[T]he Social Security Act and its regulations 'do not mandate a precise count of job numbers.'" *Goode v. Comm'r of Soc. Sec.*, 966 F.3d 1277, 1284 (11th Cir. 2020) (internal citations omitted); *Atha v. Comm'r, Soc. Sec. Admin.*, 616 F. App'x 931, 934 (11th Cir. 2015).

Here, the housekeeper and marker jobs have a combined 443,000 jobs nationally. (Tr. 25, 75-76). Therefore, the ALJ's finding that there were a significant number of jobs Cole could perform based on the housekeeper and marker jobs

constitute substantial evidence. *See, e.g.*, *Allen v. Bowen*, 816 F.2d 600, 603 (11th Cir. 1987) (concluding 80,000 jobs in national economy constituted a significant number of jobs); *Atha*, 616 F. App'x at 935 (concluding an aggregate of four occupations totaling 23,800 jobs nationally was significant). So, even if the Court were to assume that there was a conflict between Cole's RFC limiting him to occasional contact with others and the raw shellfish preparer job, the error would be harmless as Cole could perform the other two jobs—which exist in significant numbers. *See Wooten v. Comm'r of Soc. Sec.*, 787 F. App'x 671, 674 (11th Cir. 2019) (finding any error that resulted from an apparent conflict between the RFC and two positions identified by the vocational expert would be harmless because the remaining job that plaintiff was capable of performing existed in sufficient numbers); *B.S. v. Comm'r of Soc. Sec.*, No. 1:20-cv-77 (TQL), 2021 WL 1598210, *3 (M.D. Ga. Apr. 23, 2021).

Thus, when answering the ALJ's hypothetical question, there was no actual or apparent conflict between the representative occupations identified by the vocational expert and the RFC. And any apparent conflict between the limitation to occasional contact and the frequent talking aspect of raw shellfish preparer job constitutes harmless error.

## III.   Conclusion

Upon consideration of the submission of the parties and the administrative

record, the decision of the Commissioner is supported by substantial evidence.

Accordingly, it is **RESPECTFULLY RECOMMENDED**:

The decision of the Commissioner be **AFFIRMED** pursuant to sentence four of 42 U.S.C. § 405(g), and the Clerk of Court be directed to enter judgment in Defendant's favor.

Reported in Fort Myers, Florida on November 16, 2021.

NICHOLAS P. MIZELL
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections "waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." *See* 11th Cir. R. 3-1. **To expedite resolution, parties may file a joint notice waiving the 14-day objection period.**